UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
----------------------------------------------------
In re

     AMHERST ORTHOPEDIC ASSOCIATES, P.C.     05-11873 B

           Debtor          <u>DECISION & ORDER</u>
----------------------------------------------------

          Harris Beach PLLC
          Kelly C. Griffith, Esq., of counsel
          Kevin Tompsett, Esq., of counsel
          One Park Place, 4th Floor
          300 South State Street
          Syracuse, New York 13202
          Attorneys for Charter One Bank

          Zdarsky, Sawicki & Agostinelli
          Mark J. Schlant, Esq., of counsel
          404 Cathedral Place
          298 Main Street
          Buffalo, New York 14202

          Damon & Morey LLP
          William F. Savino, Esq., of counsel
          Thomas L. Kennedy, Esq., of counsel
          298 Main Street, Suite 1000
          Buffalo, New York 14202

Bucki, U.S.B.J.

     Loan agreements frequently contain the borrower's promise to pay legal fees that a secured lender may subsequently incur in the enforcement of its rights. In bankruptcy, such covenants will never create an unfettered entitlement to recover the costs and expenses of counsel. Rather, section 506(b) of the Bankruptcy Code imposes the further requirement of reasonableness. Thus, in the present dispute, the court must decide the reasonableness of attorney fees for which a secured creditor seeks reimbursement.

     Amherst Orthopedic Associates, P.C. ("Amherst Orthopedic"), is a professional corporation whose primary activity has involved the practice of orthopedic medicine. For reasons primarily related to a disputed lease of real

property, Amherst Orthopedic filed a petition for relief under chapter 11 of the Bankruptcy Code on March 15, 2005.  At that time, the creditors of Amherst Orthopedic included Charter One Bank, which held a secured claim in the approximate amount of $333,434.

The debtor's obligation to Charter One Bank included the balances due under a certain "Term Note" and a "Demand Line of Credit Note."  In August of 2003, to assure repayment of these notes, Amherst Orthopedic gave to Charter One a security interest in all of its personal property, including goods, instruments, documents, accounts, chattel paper, deposit accounts, inventory and equipment.  Further, the parties concede the due and proper perfection of this security interest.

On the day that it filed its bankruptcy petition, Amherst Orthopedic maintained a checking account with a balance of $358,406.54.  In addition, the debtor's assets included accounts receivable from patients and insurers in the amount of $1,894,813.75, as well as a receivable from one of its physicians in the amount of $41,017.53.  Together, the checking account balance and the prospective proceeds of receivables constituted cash collateral, as defined by 11 U.S.C. §363(a).  Pursuant to 11 U.S.C. §363(c)(2), the debtor would have been prohibited from using this cash collateral, except with the consent of Charter One Bank or upon order of this court.  Accordingly, at the beginning of this case, the debtor and Charter One stipulated to the entry of an order allowing the use of cash collateral in accord with the terms of an agreed budget.  The cash collateral order also gave to Charter One a replacement lien on all assets acquired post-petition, and directed the resumption of all scheduled payments of principal and interest under the original loan agree-ments.

        From time to time during the pendency of this chapter 11 proceeding,
this court extended the authorization to use cash collateral.  As required,
Amherst Orthopedic made all regular payments due under the outstanding
notes.  Then, on March 31, 2006, the debtor paid $313,626.40 to Charter One
Bank.  This sum represented the unpaid balance owed to Charter One for
principal and interest, but less the amount that Charter One had previously
applied toward legal fees incurred during the bankruptcy proceeding.  In lieu
of reimbursement for legal expenses, the debtor deposited $27,592.41 with its
counsel, to be held in escrow for application against any sums owed to Charter
One for the bank's legal fees.

        Shortly after its receipt of the debtor's payment, Charter One Bank filed
the present motion for an order allowing its legal expenses and directing
reimbursement from the debtor.  In its most recent submission, Charter One
asserts that reasonable legal fees now total $44,832.77, together with any
additional charges that might thereafter accrue.   In response, Amherst
Orthopedic objects that the requested fees are excessive and unreasonable.
The debtor is joined in this argument by its largest creditor and former
landlord, Amherst Medical Park, Inc.

        Section 506(b) of the Bankruptcy Code sets the controlling standard for
the allowance of legal expenses incurred on behalf of a secured creditor.  In
relevant part, this section states as follows:

>               To the extent that an allowed secured claim is secured
>               by property the value of which . . . is greater than the
>               amount of such claim, there shall be allowed to the
>               holder of such claim, interest on such claim, and any
>               reasonable fees, costs, or charges provided for under
>               the agreement under which such claim arose.

11 U.S.C.A. §506(b)(Thomson West 2004).  In the present instance, Charter
One's claim was secured by collateral having a value far in excess of the

outstanding obligation. Further, section 7.6 of its security agreement specifically provided that the borrower would pay all costs and expenses, "including, without limitation, reasonable attorneys' fees and disbursements, court costs, litigation and other expenses." Thus, Charter One may recover its legal fees, but only to the extent that those fees are reasonable.

Reasonableness will always depend upon circumstances. Here, Charter One's position was not just fully secured, but was tremendously over-secured. Outstanding cash deposits would suffice to discharge the entire obligation with interest. Beyond these cash deposits, the lien of Charter One extended to receivables and to equipment. Without even considering the value of the equipment, Charter One enjoyed a lien on deposit accounts and receivables that totaled almost $2.3 million as of the bankruptcy filing. At that time, therefore, the collateral was valued at more than six times the indebtedness.

Prior to the final payment of principal and interest to Charter One in March of 2006, this court granted periodic extensions of the authorization for use of cash collateral. Each such extension provided similar protections to the secured creditor. These included a prohibition against the use of cash collateral for any purposes other than those specified in the orders or their attached budgets. The orders obligated the debtor to provide Charter One with current financial information, including weekly reports of accounts receivable aging and monthly financial statements. To the extent that Charter One perceived any risk to its position, the orders allowed it to seek reconsideration of the cash collateral authorization on only a 48 hour notice to the debtor and its counsel.

With the exception of cash or cash equivalents, all forms of collateral represent some risk of a loss of value upon liquidation. Other than possibly at the very beginning of this case, however, bank deposits provided full security

for the position of Charter One Bank.  The debtor's monthly financial reports indicate a favorable comparison between Charter One's claim and the cash portion of its collateral, as follows:

| DATE | DIP ACCOUNT | PRINCIPAL AND INTEREST OBLIGATION TO CHARTER ONE |
|---|---|---|
| 04/30/05 | $  395,638.14 | $ 381,178.71 |
| 05/31/05 | $  522,402.92 | $ 381,178.71 |
| 06/30/05 | $  657,174.22 | $ 381,178.71 |
| 07/31/05 | $  807,924.15 | $ 381,178.71 |
| 08/31/05 | $  986,605.99 | $ 381,178.71 |
| 09/31/05 | $  892,056.45 | $ 381,178.71 |
| 10/31/05 | $1,010,582.33 | $ 381,178.71 |
| 11/31/05 | $1,173,280.19 | $ 381,178.71 |
| 12/31/05 | $  601,801.59 | $ 381,178.71 |
| 01/31/06 | $  674,921.25 | $ 381,178.71 |
| 02/31/06 | $  724,122.11 | $ 345,756.55 |
| 03/31/06 | $  100,080.52 | -0- |

With only three non-material exceptions, the financial reports show a general improvement in the debtor's cash position.  The exceptions occurred in September of 2005, when deposits declined slightly; in December of 2005, when this court authorized the debtor to  complete a year-end distribution to its physicians; and in March of 2006, when the debtor satisfied its principal and interest obligation to Charter One Bank.  Even after any adjustments for September, Amherst Orthopedic still retained cash equal to more than double the indebtedness to Charter One.  The payout in December of 2005 was allowed only on condition that the debtor reserve sufficient funds to satisfy Charter One's claim.  No consequence attached to the weakening of cash position in March of 2006, in as much as Amherst Orthopedic paid all principal and interest in full.  At all times relevant, therefore, the debtor preserved a cash position that assured ample protection of the indebtedness to Charter One.

I agree with the observation of Judge Blackshear, that "[t]he size of a creditor's equity cushion is an underlying factor in the reasonableness determination." *In re PCH Associates*, 122 B.R. 181, 203 (Bankr. S.D.N.Y. 1990). At all times during this bankruptcy proceeding, Charter One Bank faced no real risk of loss. To the extent that it wishes reimbursement, therefore, Charter One was required to exercise appropriate circumspection before incurring any legal costs.

In representing a secured creditor in bankruptcy, counsel might potentially undertake a range of activities. When the creditor's secured position is jeopardized, it may be necessary to participate broadly in the bankruptcy process. But when the creditor is minimally at risk, circumstances will generally require that counsel respond only to issues of material concern, such as the establishment of a process for monitoring current levels of collateral. Here, despite the entry of a cash collateral order that fully protected its client's amply secured position, counsel undertook tasks that were not necessary for the protection of its client's interests.

Counsel for Charter One Bank has submitted two sets of records for time that attorneys spent on this matter. The first set incorporates legal services rendered during the period from the filing of the bankruptcy petition until Charter One received payment on March 31, 2006, for the outstanding balance due for principal and interest. The second set includes the remainder of legal services rendered through the date of Charter One's last submission to the court.

*Services prior to March 31, 2006*

Despite any excesses in the level of legal expense that Charter One may have incurred, the court will still recognize claims related to any necessary representation. For example, Charter One may recover charges for time

devoted to the negotiation of cash collateral stipulations, to attendance at hearings to approve those stipulations, and to the review of periodic financial information. Further, counsel could properly provide a reasonable response to any extraordinary challenges to the essential adequacy of its client's secured position. Such challenges occurred in at least two instances.

The first instance involved Dr. Joseph Buran, a shareholder of Amherst Orthopedic and a guarantor of the obligation to Charter One. Two days after Amherst Orthopedic commenced this bankruptcy proceeding, Dr. Buran filed his own personal petition under chapter 11. Buran then moved for authority to use any accounts receivable that he himself might generate through his medical practice. Under his employment arrangement with Amherst Orthopedic, however, those receivables belonged to Amherst Orthopedic, and Dr. Buran was entitled only to receive a distribution of income. Even though the dispute arose in Buran's personal case, his motion gave notice to Charter One of an apparent claim to a superior interest in receivables. Under these circumstances, Charter One's counsel correctly opposed access to any funds in excess of authorized distributions from Amherst Orthopedic.

The second instance involved Charter One's response to the debtor's motion to authorize a year-end distribution to its physicians. If granted, this motion would have caused a reduction of funds in the debtor's DIP account to a level less than the outstanding balance owed to Charter One. Although Charter One would still retain a security interest in accounts receivable, the bank was within its rights to oppose so substantial a change to the cash component of its adequate protection.

Although the majority of legal services were proper, certain aspects of counsel's representation were simply unnecessary. Based upon a reading of each time entry for services rendered prior to March 31, 2006, I have identified

the following five areas of charges that do not fully satisfy the standard for reasonableness:

1. *Creditor Meetings:*  Counsel spent almost ten hours in preparing for, attending, and reporting the outcome of creditors' meetings held pursuant to 11 U.S. §341.  All of these meetings, however, were held after this court had approved the order authorizing use of cash collateral.  With its rights thereby protected, Charter One could not reasonably expect to obtain any meaningful benefit from attendance at the meetings required under section 341.

2. *Landlord's motion for Adequate Protection:* The present bankruptcy proceeding was precipitated by a judgment that the debtor's landlord, Amherst Medical Park, Inc., had obtained against the debtor.  Having delivered that judgment to the sheriff, Amherst Medical Park claimed a lien on all personal property of Amherst Orthopedic. *See In Re New Life Builders, Inc.*, 241 B.R. 507 (Bankr. W.D.N.Y. 1999).  In July of 2005, Amherst Medical Park moved to compel the debtor to pay adequate protection in the amount of $35,000 per month.  Charter One's counsel then devoted almost eleven hours of time in responding to that motion.  At the time of the motion, however, Charter One already enjoyed the benefit of a cash collateral order which recognized a first replacement lien on assets that included the debtor's deposit accounts and receivables.   As of June 30, funds in the debtor's deposit accounts had increased almost $300,000 since the commencement of bankruptcy on March 15.  Under these circumstances, the payment of $35,000 per month would not have jeopardized the fully secured position of Charter One.   To the extent that payments to the landlord might impact the bank's secured position in the future, the cash collateral order allowed Charter One to request further relief on only two days notice.  Although this court essentially denied the landlord's motion, the bank had nothing to gain from its opposition.  Rather, Charter One

should have deferred to the argument of debtor's counsel. Under all of the circumstances, Charter One's response to the landlord's motion was simply not needed for the protection of the bank's interest as a secured creditor.

*3. Motion to Convert:* Charter One's counsel devoted more than 15 hours to the support of a motion by the debtor's landlord for the conversion of this case. During the pendency of that motion, however, Charter One already enjoyed the protection of its cash collateral order. To the extent that Charter One believed that its collateral position was endangered in any way, the cash collateral order allowed it to bring its concerns to the court on only 48 hours notice. Charter One never requested such reconsideration. In truth, Charter One was at all times secured by bank deposits that exceeded the outstanding balance of its claim. Under these circumstances, counsel's level of participation on the motion to convert was unnecessary. Although Charter One had every right to support conversion, it may not reasonably impose upon the debtor the full cost of advocacy for that outcome.

*4. Correction of Accounting Errors:* As part of its response to the debtor's motion to authorize a year-end distribution to the physicians, Charter One erroneously represented that the debtor was delinquent in its payments under the loan agreements. Although counsel's time entries are somewhat imprecise with respect to efforts to correct these errors, it appears that attorneys may have spent several hours to resolve the problem. Because it made the accounting mistakes, Charter One may not charge the debtor for the expense of correction.

*5. Other Services having tangential relationship to secured claim:* In addition to the services identified in paragraphs one through four above, counsel rendered slightly more than 100 hours of other services prior to Charter One's receipt of payment in March of 2006. Arguably, all of this time relates

in at least some remote fashion to the debtor's use of cash collateral and to recovery of the indebtedness.  In light of the adequacy of Charter One's secured position, however, a meaningful portion of the services were not reasonably necessary for the protection of the bank's interests.  For example, in August of 2005, counsel spent approximately two hours to review a motion to reject an employment agreement.  In November of 2005, Charter One's attorneys attended more than four hours of depositions that another party had requested of principals of the debtor.  On several routine motions, counsel chose to appear through an associate attorney from an office more than 100 miles away, even though the law firm includes partners and associates who work from an office near to the bankruptcy court.  Although the more complex issues might have justified an appearance by lead counsel, local associates should have handled any simple appearances.

In its application for reimbursement, Charter One asserts that "it was imperative to file pleadings and participate in the hearings on the various issues that came before the Court."  If Charter One faced any serious risk of loss in this case, I could accept the need for an aggressively proactive approach to legal representation.  In the present instance, however, the court will allow only a level of reimbursement that is reasonable under circumstances where the creditor enjoyed  a substantially adequate protection of its security interest.

The attorneys for Charter One have documented 144.8 hours of services rendered prior to March 31, 2006.  For these services, Charter One seeks reimbursement of $33,233.50.  However, the bank derived minimal benefit from most of the services described in categories one through four above. After taking further account of the services described in the fifth category, I find that at least one-third of the total services were not necessary for effective representation.  Accordingly, with respect to this first portion of its claim for

reimbursement, reasonable legal fees total no more than $22,155.67, that being two-thirds of the asserted value of services.

During the period prior to March 31, 2006, in addition to its charges for services rendered, Charter One's counsel incurred disbursements in the amount of $895.89.  Of this total, the sum of $385.09 represented travel expenses for attendance at hearings where either counsel's participation was not reasonably necessary, or an associate from the firm's local office could easily have handled the matter.  Accordingly, for this period of time, the court will allow reimbursement of disbursements only in the amount of $510.80.

*Services after March 31, 2006*

Subsequent to March 31, 2006, Charter One's attorneys rendered 41.2 hours of additional services.  Nearly all of this time involved the present application for reimbursement.  In particular, counsel devoted substantial effort to research regarding the reasonableness standard of 11 U.S.C. §506(b), and to the preparation of the various papers submitted in support of the reimbursement request.  Now at issue, therefore, is the reasonableness of services rendered to establish the reasonableness of other services.

Amherst Orthopedic filed its bankruptcy petition voluntarily, and not at the insistence of Charter One.  Because a fee application would normally not be required outside the bankruptcy context, Charter One may request reimbursement for the cost of preparing the fee application itself.  Nonetheless, all work in support of the fee application must still satisfy the requirement of reasonableness.  For example, a creditor should not receive reimbursement for the cost of asserting an unfounded fee request.

For legal services rendered after March 31, Charter One seeks reimbursement in the amount of $10,053.  Although a portion of these charges

represented the cost of preparing the fee application itself, an equally significant part involved a defense of suspect services for which this court has denied reimbursement.  Taking all relevant factors into account, I will allow $5,000 as the value of services reasonably provided to Charter One after March 31, 2006.  In addition, I will allow the requested reimbursement of disbursements in the amount of $650.38, in as much as these would have been incurred even if Charter One had requested the lesser value of services that this court is prepared to allow.

*Conclusion*

In all respects, Charter One has liberty to define the scope and character of the legal representation that it wishes to employ in the bankruptcy of any of its customers.  When it seeks reimbursement for legal fees and disbursements, however, Charter One must satisfy the requirement of reasonableness.  Here, I find that counsel provided reasonable legal services having a value of $22,155.67 for the period prior to March 31, 2006, and reasonable legal services having a value of $5,000 for all subsequent months.  In addition, I am satisfied with the reasonableness of disbursements in the amount of $510.80 and $650.38, for the two respective time frames.

Based upon the foregoing, the claim of Charter One Bank for reimbursement of legal costs and expenses will be allowed only in the amount of $28,316.85.

So ordered.

Dated:        Buffalo, New York                    /s/    CARL L. BUCKI
              October 26, 2006                              U.S.B.J.